Walter J. MAYNARD, Appellant,

v.

KENOVA CHEMICAL COMPANY, Appellee.

No. 79–1563.

United States Court of Appeals, Fourth Circuit.

Argued June 2, 1980.

Decided July 28, 1980.

Lawrence B. Lowry, Huntington, W. Va. (Barrett, Chafin, Lowry & Hampton, Huntington, W. Va., on brief), for appellant.

Charles F. Bagley, III, Huntington, W. Va. (Gale R. Lea, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W. Va., on brief), for appellee.

Before WINTER and BUTZNER, Circuit Judges, and WALTER E. HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

PER CURIAM:

Maynard brought this action against Kenova Chemical Company to recover damages for an injury sustained on October 21, 1975, when he fell from an allegedly defective scaffolding while working on Kenova's premises. At the time of the accident Maynard was employed by Manpower Temporary Services. Manpower is in the business of supplying temporary labor as needed to all types of industrial and commercial concerns. When a customer makes a request for a temporary worker, Manpower sends one of its employees to the customer with directions to follow that customer's instructions. The employee is given a work slip or "ticket". The customer fills in the number of hours worked by the employee who, in turn, gives the ticket to Manpower. Manpower pays the employee in accordance with Manpower's salary scale, and then bills the customer at a higher rate to compensate for expenses and profits, including Manpower's cost of subscribing to the Workmen's Compensation Fund.

On October 21, 1975, Manpower sent Maynard to Kenova to perform work in the nature of general labor under the direction and supervision of Kenova. At some point during the day some scaffolding collapsed and Maynard was injured. Maynard filed a workmen's compensation claim against Manpower and received a permanent partial disability award of $10,637.97. He subsequently filed the present action against Kenova as a third party tort-feasor, alleging that the dangerous and defective condition of the scaffolding was the proximate cause of his injury.

Kenova moved for summary judgment on the grounds that it was the employer of Maynard when the accident occurred, that Kenova subscribes to the West Virginia Workmen's Compensation Fund and that, therefore, the action is barred by the provisions of *W.Va.Code*, 1931, § 23–2–6, as amended.[1] The district court, by memorandum opinion and order, found as a matter of law that Maynard was the employee of Kenova within the meaning of the workmen's compensation laws of West Virginia and that, accordingly, he is precluded from maintaining this action by Section 23–2–6. The court entered summary judgment for Kenova.

Maynard argues on appeal that the court erred in finding that he was an employee of Kenova on the day of the accident. He relies upon *Kirby v. Union Carbide Corporation*, 373 F.2d 590 (4th Cir. 1967), a case essentially similar to this case. In *Kirby*, there existed a written agreement between Du Pont and Union Carbide which provided that employees supplied by Du Pont to Union Carbide would remain Du Pont employees even though they worked on the premises of and under the daily supervision of Union Carbide. Kirby, an employee of Du Pont, was killed while working at a Union Carbide oxygen plant. Both Du Pont and Union Carbide were subscribers to the West Virginia Workmen's Compensation Fund; nevertheless, Kirby's representative sought to recover in a wrongful death action against Union Carbide. The district court granted summary judgment for Union Carbide, holding that, as a matter of law, Kirby was Union Carbide's employee and that Kirby's exclusive remedy was under West Virginia's Workmen's Compensation Act. We reversed, holding that in view of the facts: (1) that the contract between Du Pont and Union Carbide provided that bor-

1. That section provides in pertinent part:

Any employer subject to this chapter who shall subscribe and pay into the Workmen's Compensation Fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided, shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter.

.    .    .    .    .

rowed employees, such as Kirby, were to remain Du Pont employees; (2) that Union Carbide did not treat Kirby as an employee; (3) that Union Carbide assumed no responsibility in connection with the compensation award; and, (4) that contractual language governed Union Carbide's liability for injury to Du Pont employees, Kirby was not such an employee of Union Carbide as to preclude his personal representative from seeking redress against Union Carbide for injuries resulting from its negligence.

Maynard contends that *Kirby* should be controlling in this case because the relationship between Manpower and Kenova is similar to the relationship which existed between Du Pont and Union Carbide. The district court rejected this contention; the court found that Kenova, by virtue of the loaned servant doctrine, was a special employer of Maynard at the time of his injury. We agree with the district court's analysis.

Our decision in *Kirby* was premised on the validity of the contractual arrangement between Du Pont and Union Carbide; the contract provided in express terms that Union Carbide could be held liable for negligence resulting in injury to Du Pont employees. 373 F.2d at 595. There was no such arrangement, either express or implied, between Manpower and Kenova. Moreover, in *Lester v. State Workmen's Compensation Commission*, W.Va., 242 S.E.2d 443 (1978), the Supreme Court of Appeals of West Virginia at least partially negated the effect of *Kirby* by holding that the liability of an employer arises from the law itself and not from any contractual relationship aside from that which is inherent in an employer-employee relationship.[2] Thus, *Lester* precludes employers, such as Manpower and Kenova, from entering into contractual arrangements governing liability for injuries to employees, such as May-

nard. Such liability would be governed by the provisions of the West Virginia Workmen's Compensation Act.

In *Kirby*, we relied on the contract and the circumstances existing between Du Pont and Union Carbide to find that there was no employer-employee relationship between Union Carbide and Kirby. The contract specifically provided that employees supplied by Du Pont to Union Carbide were to remain employees of Du Pont. In the present case, the only agreement between Manpower and Kenova was that contained in the work slip or "ticket" which Manpower gives to each worker assigned to a temporary job. The reverse side of the ticket contained the following: "The customer recognizes Manpower's employer-employee relationship with its personnel and accepts the obligation to discuss all matters concerning their employment, job assignments, pay procedures, etc., with Manpower." This language, in and of itself, fails to establish that there was not an employer-employee relationship between Kenova and Maynard. *Lester* prevents us from relying on other factors, such as an agreement between Manpower and Kenova regarding liability for injury to employees, in making our determination of whether there existed an employer-employee relationship. Therefore, nothing precludes the application of the loaned servant doctrine to find that Kenova was an employer of Maynard.

The loaned servant doctrine provides that an employee directed or permitted to perform services for another "special" employer may become that employer's employee while performing those services. *Restatement (Second) of Agency* § 227 (1958). The doctrine is based upon the premise that an employee may have more than one em-

---

**2.** The following conclusion is found in *Lester*, 242 S.E.2d at 450–451:

Therefore, despite our course of decisions in this area of the law, [we] are of the opinion that the rights and duties under our workmen's compensation statute are no longer contractual but grow out of the employer-employee status to which the law attaches certain duties and responsibilities. The lia-

bility of employers arises from the law itself, rather than from any agreement of the parties. The only significance adhering to the contractual relationship is the existence of an employer-employee relationship. Once the employer-employee relationship is established, the statute imposes certain duties and responsibilities on the parties to that relationship.

ployer while doing a specific act. *See Beaver v. Jacuzzi Brothers, Inc.*, 454 F.2d 284, 285 (8th Cir. 1972); *St. Claire v. Minnesota Harbor Service, Inc.*, 211 F.Supp. 521, 526 (D.Minn.1962). Maynard, who was in the general employment of Manpower, was directed to perform services for Kenova, which thus became his special employer.

■ 1A Larson, Workmen's Compensation Law, § 48.00 provides:

> When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if
>
> (a) the employee has made a contract of hire, express or implied, with the special employer;
>
> (b) the work being done is essentially that of the special employer; and
>
> (c) the special employer has the right to control the details of the work.
>
> When all three of the above conditions are satisfied in relation to both employees, both employers are liable for workmen's compensation.

The district court correctly found that all three of these conditions were satisfied in the present case. When Maynard accepted employment with Manpower, he necessarily agreed to perform work for Manpower's customers. In addition, Manpower employees had the right to refuse certain assignments. This is sufficient to establish that Maynard made an implied contract of hire with Kenova. *Chickachop v. Manpower, Inc.*, 84 N.J.Super. 129, 201 A.2d 90, 95 (1964). The district court found it to be uncontroverted that Maynard was performing a task that was part of Kenova's regular course of operations, and that while he was performing that task, he was under the complete control and direction of Kenova's supervisory personnel. Accordingly, Kenova is liable under West Virginia's Workmen's Compensation Act and is not liable in tort.

The district court also correctly noted that, under West Virginia law, Kenova's authority to exercise complete supervision and control over Maynard while he was on Kenova's premises established Kenova as Maynard's employer within the meaning of the workmen's compensation statutes:

> A review of authority in West Virginia on what standards are to be used in determining the employment status of a worker indicates that while it is necessary to consider the entire circumstances of the relationship, the right to exercise control and supervision is still the determinative element. *Myers v. Workmen's Compensation Commissioner*, 150 W.Va. 563, 148 S.E.2d 664 (1966); *Spencer v. Travelers Insurance Co.*, 148 W.Va. 111, 133 S.E.2d 735 (1963); *Davis v. Fire Creek Fuel Company, et al.*, 144 W.Va. 537, 109 S.E.2d 144 (1959).

.    .    .    .    .

Other courts have emphasized the element of right of control in resolving questions of employer status in cases involving customers of labor brokers. *See, e. g., Beaver v. Jacuzzi Brothers, Inc.*, 454 F.2d at 285; *St. Claire v. Minnesota Harbor Service, Inc.*, 211 F.Supp. at 523.[3]

For the stated reasons, we find that the district court acted correctly in this case. We agree that Kenova was the employer of Maynard on October 21, 1975, that Kenova was, on that date, a subscriber in good standing with the workmen's compensation fund, and that this action is barred by *W.Va.Code*, 1931, § 23–2–6, as amended.

AFFIRMED.

---

**3.** We note that the court in *St. Claire v. Minnesota Harbor Service, Inc.*, on facts very similar to this case, considered the "most damning fact" against the plaintiff-employee to be that part of the difference between what the defendant-employer paid Manpower and what Manpower paid the plaintiff went towards paying the plaintiff's workmen's compensation premium. "In other words, *the plaintiff [was] suing in tort the man who paid for his Workman's Compensation.*" 211 F.Supp. at 528. In the *St. Claire* court's opinion, such a case "strikes at the heart of the Workman's Compensation law" and "is in unequivocal opposition to the well-known principles on which Workman's Compensation is founded." *Id.* The same argument may be made in this case.